Good morning everybody. We're going to begin this morning with case number 1, Divane v. Northwestern University. Appeal number 18-2569. For the appellant, we'll begin with Mr. Wolf. Good morning, your honors, and may it please the court, I would like to reserve five minutes for rebuttal. This court has already held that a fiduciary cannot insulate itself from a simple expedient of including a very large number of investments in a plan and then shifting to participants the responsibility for choosing among them. Yet that is precisely what Northwestern did with its plans in this case. It had 242 investments, which it admitted after discovery that it could not possibly monitor each one of those for prudence, and also was not monitoring how much revenue sharing was paid by those funds for the recordkeeping services that the two service providers were providing in this plan, both TIAA and Fidelity. In addition to those allegations showing a plethora of investments that could not possibly be monitored by the fiduciaries, in which the fiduciaries admitted were not being monitored, plaintiffs also showed that numerous of these investments were imprudent on their own. They showed that of those 242 investments, only 208 of them even had a five-year performance history, so a large number of those investments were new investments, untested investments. Of those, 192 underperformed their own stated benchmarks in the preceding five-year period, and of those, 93, 119 underperformed in five years, and of those, 93 underperformed both for the preceding five years and the preceding 10-year period. So consistent underperformance of those funds, yet they stay in the plan. In addition to that, plaintiffs showed that 129 of these investments were in share classes that were more expensive than what was available to the plan. Again, evidence of an imprudent process. The process was lacking in effort, competence, or loyalty by the fiduciaries of this plan. Plaintiffs also showed that revenue sharing provided by these mutual funds to the plan's record keepers could not have been monitored because it resulted in compensation to those record keepers because of the asset-based nature of those fees of hundreds of dollars. When a plan of this size, these two plans, the one plan, the retirement plan, is over $2 billion. Combined, the two plans are almost $3 billion. A plan of that size should have been paying no more than the equivalent of $35 per participant. Was this confined to just the employees of Northwestern? Yes, those are the only ones. With that amount of money? Yes. Yes, the participants and the plan. The plans that were offered, where's the $2 or $3 billion? What does that figure mean? That means the total amount of money that is in both of these plans combined. Just confined to Northwestern? Right, just in the Northwestern plan. There's the retirement plan, which includes employee contributions and matching contributions by the university. There's over $2 billion. Then in the voluntary savings plan, which is employee-only contributions, there's over $500 million or so. As far as you're concerned, way too many choices? Well, choice is good, but 242 choices is overwhelming. In fact, the consultant to Northwestern, when they finally brought one in in 2011, belatedly, said there are way too many choices here. Is that when they cut it down to 40 or so? Well, for some reason, they waited until 2016 to cut it down to 40 or so. You submitted the 28J letter with regard to the Sueda case from Third Circuit. Yes. We obviously have the Hecker case and the Loomis case here from our court. Yes. How do you suggest, if we're going to go in a direction of Sueda, that we deal with Hecker and Loomis as prior precedent? Well, Hecker and Loomis both concern circumstances where all the plaintiffs did, all the participants did in that case, was say, this is a bad menu, and there was better alternatives out there, without focusing on the recklessness or unsoundness or imprudence of any particular investment. And both the courts pointed that out. And if we're grouping the cases into process cases and result cases, is it fair to characterize our prior precedent as more result, looking at the result, versus looking at the process? Not necessarily, Your Honor. The Hecker and Loomis cases both say that when you can't say that there's something wrong with the menu without citing specific items of imprudence, just by saying that you have all of the same mutual funds from a single investment company. So you have a plan of fidelity funds, 20 or 30 investments from fidelity, that's imprudent on its own, and therefore we get through the gate. That's not enough. Both those courts point out is that, well, there's nothing wrong, per se, with doing that. You've got to show that there was something wrong with those investments. And that's what the plaintiffs did here. The plaintiffs pointed out that they're in more expensive share classes than were available to these plans. Most of the vast majority of these funds underperformed, and so weren't being monitored. Something that Northwestern eventually admitted in discovery. And so those specific allegations showing specific problems with specific investments are something that shows an imprudent process that gets around just saying, well, something else out there was better. And what Hecker and Loomis say is that, just saying something else out there was better isn't enough. So are you asking us to make a distinguishment of Hecker and Loomis based upon the nature of the claims that the plaintiffs are bringing? Yes. The specificity of the pleadings to the extent that they can specify facts given the limited access to information that they have. Were they underperformed compared to what? Underperformed to their own stated benchmarks. And in addition to that, if that weren't enough, plaintiffs also showed underperformance relative to other comparable investments. So for instance, the TIAA real estate account, that's a real estate investment. A common alternative real estate investment is the Vanguard Real Estate Investment Trust Index Fund. And we showed underperformance relative to that index over five and ten year periods also. The index fund seems to be what you think everybody ought to have, and that's it. Not necessarily, Your Honor. Not necessarily. But if, in comparing to an alternative, albeit an index fund, you see that it charges vastly higher fees and it has vastly underperformed over five and ten year periods, that at least suggests that the fiduciaries are sleeping on the job and not even monitoring this and don't have a good reason for choosing it and requires the fiduciaries to at least say, well, did we compare the TIAA real estate account to alternatives? And even though it was worse than the alternative, do we have a reasoned decision for going ahead with the real estate account? Because that's what this Court requires in George v. Kraft Foods Global. The fact that there was such a disparity in performance between these two similar investments plausibly suggests that they didn't do that comparison and don't have a reason. But it's for discovery and decision on the merits as to whether, in fact, they did do that investigation and they do have a reasoned decision. And if they can prove that they went through that process, even though the results were wrong, they will survive and get a judgment in their favor. But that sort of getting into the merits, did you make a decision? Did you consider the relevant factors? Is something that can only be discovered in discovery and it can't be decided at the pleading stage, because that all happens behind closed doors and is not divulged to the participants in the plan. Let's talk a little bit about that pleading. Can you describe what, in your proposed second amended complaint, was different about the claims than the first amended complaint? Yes, so in the second amended complaint, what we sought to do were three things. One was to set out, more specifically, in the new count seven, the allegations regarding the breach as to using the more expensive share class of the 192 some odd mutual funds that were in there. Second was to point out that the fiduciaries eventually adopted an investment policy statement which required to establish benchmarks for each of the plan investments and that the fiduciaries didn't follow that investment policy statement in their review of the plan. So that was added as an additional count and that's also a separate breach under section 1104A1D which requires fiduciaries to follow the instruments governing the plan of which the investment policy statement is one. And then the third item that was added were the counts regarding TIAA using participant information for its own marketing purposes to market its financial services and other services to participants to gain business outside of the plan. It's relying on the same information though in those four new counts, correct? No, that's not correct, Your Honor. The share class claim, yes, it's just setting that out as a separate breach from count five which included underperformance and other items. The IPS wasn't discovered until it was produced in discovery and the IPS claim whether the fiduciaries were actually following that document we didn't discover that until we went through the depositions in March and April. So it couldn't have been asserted in the complaint because the participants were provided the IPS and certainly didn't know whether the fiduciaries were following the document or not. As to the TIAA marketing strategy we did not know until discovery that in fact the fiduciaries were just letting TIAA use participant information to go out and solicit participants for its own business. And then the second iteration of the second amending complaint which came after the judge's dismissal order and denial of our motion to alter or amend the judgment was adding additional information that was gleaned from depositions that had taken place since the filing of motion for leave on the first second amending complaint. So all of those detailed allegations show a lack of process on the defendant's part. Taking into account all the information that was discovered in the year of discovery, we found out that Northwestern wasn't doing anything in this plan until 2011 when it forms the investment committee and finally brings in a consultant to advise it on what to do with its plans to discharge its duties. And that consultant said you've got too many options, you can't monitor them all, participants can't effectively decide, you're barring yourself from getting into lower cost mutual funds because you're spreading assets too far, you've got to monitor revenue sharing, you've got to recover excess revenue sharing from these service providers because they're plan assets and go back into the plan. And despite that advice, Northwestern doesn't do anything until 2016. In 2015 it gets another consultant to come in and say basically the same thing. Too many investment options, participants can't effectively decide. It's inefficient. You're causing the plan excessive expenses. Your revenue sharing, recordkeeping expenses are out of control. The first time that the fiduciaries even asked TIAA for a reduction in its recordkeeping fees, it dropped from $150 per participant to $42. That's just from asking. So imagine what effective negotiating would have done. Imagine what putting the plan's recordkeeping services out to competitive bidding would have done. And Northwestern admitted they never put the plan services out for competitive bidding. This court in George v. Kraft said that not putting a plan out for competitive bidding and evidence that it was overpaying for recordkeeping fees not only states a claim, it's sufficient to reverse a summary judgment that was granted in favor of the fiduciaries. Despite all that, only in 2016 does Northwestern reduce the plan down to 40 investment options, get rid of all of the duplication that was going on. There were numerous investments in the same investment category including two groups of target date funds, which makes absolutely no sense. They get rid of that, they go to an outside provider, they don't limit themselves to just TIAA and Fidelity investment options and come up with a completely different plan. In 2016 when they should have been doing this well before 2010, which is the start of the limitations period in this case, all of those facts show a fiduciary process that was deficient tainted by a lack of effort, competence, or loyalty. And they state a claim upon which an award to the plan of its losses can be granted in this case under a risk. Let's touch briefly on your request for a jury trial. Any other federal appellate court or federal district court ever recognized the right to a jury trial in these factual circumstances? Yes. The court in the Southern District of New York in the Cornell case recognized that plaintiffs have a right to a jury trial and we are going to be proceeding soon to a jury trial in that case. Was there a motion to dismiss or a summary judgment motion practice in that case? Yes. Did it go to the second circuit at all? No, not on an intermediate appeal. There's no cases from the circuit court. Correct, correct. And most district courts that have examined this issue have said there is no right to a jury trial because we're talking about trust and fiduciaries and enhancing equity practices. But this wouldn't be the first time that all the district courts are wrong. And the one district court that made the right decision is right. And the arguments that we made in our brief show compellingly that because ARISA authorizes recovery of losses to the plan, damages, that is traditional legal remedy to which there's a right to a jury trial. There's the matching funds issue for, there was matching funds in one segment and not matching funds in the other. Yes. And the other was I guess that was an option to go in that direction and more of a risk I guess or maybe more people are more astute about how they're investing. What was the difference? The investments were the same in both plans for all intents and purposes. It's just the employee is deferring more of his or her salary into her retirement savings program. Some people can afford to do that. Some people can't. I'd say an employee was getting some in the beyond whatever they would match. Right. So it's an additional amount they could put into the voluntary savings plan which wouldn't be matched, comes out of their salary, but they're saving for the future. Unfortunately not everybody does that. You're into your rebuttal time. Thank you, Your Honor. Thank you, Mr. Wolf. Mr. Martin. May it please the Court. My name is Craig Martin. I represent Northwestern with regard to this appeal. To begin with our position is that the Court should affirm the dismissal of this case under Rule 12b-6, affirm the decision of the District Court, which was thorough, thoughtful, and well-reasoned. That decision was carefully based on the precedence of the Seventh Circuit Court of Appeals. Both in the Hecker case and in the Loomis case. In that decision, the District Court also carefully reviewed the ERISA statute with regard to what it provides and what it doesn't provide. And the District Court also carefully reviewed this Court's precedence and the Supreme Court's under Rule 8, specifically Twombly and Iqbal and other cases with regard to Rule 8. The District Court's opinion then carefully went through each of the claims in the Plaintiff's complaint and then went through the Plaintiff's second amended complaint as well that the Plaintiff's attempted to file or moved for leave to file with six days left in the discovery period. What I'd like to do is begin and tether the Court to the opinions in Hecker v. Deere and Loomis because we do not think that those opinions are distinguishable from the case at bar and we think that those opinions are controlling with regard to this case. With regard to the Deere case and Judge Mannion, I believe you were on the panel on the Deere case. With regard to the Deere case in Deere, it's a 401k case. In that case there's 23 mutual funds, there's two investment funds, there's a company stock fund and then there's an investment window with 2,500 options. With regard to that case there's essentially two critical holdings that are here. One is the Court essentially says that those options or that lineup of options satisfies and discharges any breach of fiduciary duty claim but it frames it in the context of the pleading standard under Twombly. It essentially says that you can't make a plausible inference with regard to this lineup of funds that there's some breach of fiduciary duty sufficient to get you into discovery. The Deere case is pretty clear with regard to that. The second thing that the Deere case is very clear with regard to is the Deere case takes a careful examination of expense ratios or what they commonly call revenue sharing in order to pay for the administration of the plan if you will, which is asset based. The Deere case essentially takes a look at that and says that's fine. The reason the Deere case says that that's fine is because you basically disclose or tell participants in a plan with regard to all their options and in that case about 24, 25 options plus 2,500 through a brokerage window. You're basically telling them look at the two key things. Look at what investment returns have been and look at what the cost is and that's what you need to know as an investor with regard to these types of funds. With regard to the expense ratio, the Deere case essentially says, look the expense ratio you have a choice. So if you want to go ahead and pick a suppose you like to invest in small cap India funds as opposed to Fidelity Index funds and Fidelity Index funds have a low expense ratio and small cap India funds have a high expense ratio. You as an investor are in those lineups. The Deere case essentially uses the words paternalistic with regard to the theory that plaintiffs pursued and ultimately dismisses the case under both of those grounds. Now I do want to comment about something that came up in the argument. There is a second opinion in the Deere case and that opinion is basically a response to the Department of Labor a brief that the Department of Labor filed and the Deere case in the second holding says, hey look, we are not making some broad pronouncement that we're going to bless this or bless that. We are telling you what the holding of this case is. This particular lineup, this particular complaint does not get past a motion to dismiss under Rule 12. How many employees is Northwestern talking about that had the option I guess that are under this plan? It's two different plans. It's a voluntary savings plan. The voluntary savings is the one beyond matching. Correct. The retirement plan has a generous 5% match. It's a fabulous retirement plan. With respect to employees, I believe there's about 21,000 in the retirement plan and there's less in the voluntary savings plan. It provides retirement benefits from somebody who is a cafeteria worker all the way to somebody who is the star professor researcher that they just recruited from MIT, say. It's a very broad-based plan with regard to all of the employees with respect to Northwestern. There is going to be a difference in sophistication about when they pick stuff out and what they're going to invest in. They joke about it, about a professor teaching something and then the other one teaching economics or something. There's a whole lot of people who are not professors and do a lot of other things for Northwestern. There's a wide range of people in these plans and that's an important point, Your Honor. Because one of the things that is really critical in the higher education environment is you see the allegations and the complaint about this. TIA-CREF founded, I believe, in 1914 or 1918 by the Rockefeller family as a charitable institution, right? The purpose of that was to provide higher education with retirement planning, retirement funds. Nobody else provided it. You get to about the 1990s, 2000s and others start to compete in that market. The most popular and you can see it as demonstrated by where the investments are, the most popular option with regard to the academic community is the traditional annuity option. The thing that requires long-term planning with regard to whether you're going to put your money into it, it gives you a solid interest rate, flat interest rate of I think 3% in the TIA annuity and gives you the opportunity to plan for your retirement so that you can look at what your social security is going to be, what the annuity is going to be. It's a very unique lineup and in fact the most popular fund is that TIA annuity which, as the district court pointed out, comes with tethering to TIA as record keeper and comes with the TIA CREF stock fund which they take issue with. But a very robust sophisticated set of offerings with regard to the educational environment so that folks have options and choice but they also have the types of funds that people in the educational environment like to have. I want to ask you some more questions with regard to process versus results. SUEDA comes down, comes in a 28J submission. We get your response, we review both. In SUEDA, on my pages 14 to 15, the 3rd Circuit says that bearing these fiduciary duties in mind, a court assesses a fiduciary's performance by looking at process rather than results. We've got our precedent of Hecker and Loomis those are going to be cabined as result type cases in SUEDA as a process case what is your client's position with regard to how we should deal with a precedent like SUEDA? It appears to be very factional analogous literally some of the same investments. Yes, with regard to there's a couple of positions. One is, with regard to SUEDA, you can make some factual distinctions. One factual distinction with regard to SUEDA is an issue that doesn't get play is the thing I was just talking about and that is tethering or tying of the annuity to the CREF stock fund so that doesn't get play in the SUEDA decision. Another thing that doesn't get that you have in this case is in this case you essentially have the ability to look back because this case went through  the discovery period ended and then the district court ruled on the motion to dismiss but ultimately your honor our position is that SUEDA is inconsistent with the decisions of this court in Loomis and in Hecker and Deere if those factual distinctions do not get you around SUEDA. Swayster-Wolf points to differences in the causes of action and the claims being made what's your response to that? There's no material differences in the causes of action and the claims being made. What these are your honor, to be blunt about it is in August of 2016 a plaintiff's firm began to file a series of lawsuits against a number of universities in the 403B in these cases. Those cases are largely cookie cutter complaints and the effort with regard to those cases is to try to get into discovery and cost the universities money so that they settle these cases. They're cookie cutter complaints and the basic attack is that, and by the way you can make this attack in any 401K plan or in any 403B plan the basic attack is oh look, you must be breaching your fiduciary duty in some way so let us get past the strict pleading standards in Twombly in order to get into discovery because when he said 119 of the funds underperformed well look, I think there's about 240 funds it's actually about half of the funds underperformed and half of the funds outperformed, which is what you would expect from an investment lineup there are different reasons for all of that and ultimately we would come back and say the court should  Iqbal with regard to the notion that you just because you're pleading facts doesn't mean that you can make a plausible and reasonable inference that there is a breach of fiduciary duty with regard to the fund lineup that is offered that does not suffice under Twombly and Iqbal but more importantly your honor, it doesn't suffice under the cases that this court has decided in Hecker vs. Deere and in the Loomis case and if I could turn if you want to ask anything more about that but if I could turn to the Loomis case the Loomis case is also directly on point the first case at Hecker was authored by Judge Wood, the Loomis case was authored by Judge Easterbrook with regard to Loomis Loomis has 32 options, 24 mutual funds different expense ratios so that people have choices with regard to the plan and with regard to the retail vs. institutional argument, it is taken on head on in the Loomis case and there Judge Easterbrook says that just because you're alleging that retail is worse than institutional or worse than wholesale, the other word that they use to describe it, doesn't mean that that's a plausible allegation that gets you past the pleading standard and in that case Judge Easterbrook carefully goes through several reasons that that's the case he talks about how retail funds are marked to market he talks about the liquidity or illiquidity of different funds, he talks about how they are valued differently, he talks about daily withdraw and the difference between unitization and he talks about participant control he also you really want to refer to the author of the case as opposed to the other two judges, it's really the court oh yes, the court, I'm sorry and the court goes through and then carefully goes back to the Hecker case and basically says that this is the same type of argument that is made in the Hecker case that flopped and he rejects or the court rejects the argument entirely, so going back to your question our position is that the cases of the 7th circuit are far more results oriented if you take a look at them and they look at the overall line up of the funds before they get into any types of process issues or nitpicking with regard to things Could you address the Brayden case from the 8th circuit and how you think it should impact the analysis of this case? Yeah, I don't think that Brayden I think there's another line of cases and Brayden is one of them and Brayden is different in the sense that in that case the fiduciary actually stands to gain a benefit from the structure of the investments So the allegation in Brayden is a taint type of allegation that doesn't exist in these cases, in the cases that are at issue here. So it's basically the Brayden case is essentially a case in which they are saying that there was some benefit from putting them into these types of funds that the plan was getting. In this case there's no benefit that the plan was getting. So there's a number of cases out there and in fact the Deere case does this a little bit, that look at you could say it like this, is there some kind of plus factor that gives you something else in the case? The Deere case actually talks about the Verity vs. How case at one point and basically says look there's no allegations like there are in the Verity vs. How case this is simply a case about what the lineup of investments is and what the expense ratios are just like the case at issue here So we don't think that Brayden is applicable with regard to this set of facts. How about this jury trial right that's been recognized apparently by the Southern District of New York District Court? What's your position with regard to that ruling? There's one ruling I believe in the Cornell case that hasn't been up to the Second Circuit. There's multiple rulings in this circuit, in the Seventh Circuit. The Matthews vs. Sears case which is 144 F3 461 at 468 says that there is no right to a jury trial in an ERISA case. The Patton case Patton at 480 F3 478 484 says that in ERISA cases the plaintiff has no right to a jury trial The McDougall case from this circuit 494 F3 571 says the Seventh Circuit's general rule in ERISA cases is that there's no right to a jury case so if you, and this is in our record, if you canvass the law of this circuit, there is no court holding that there's a right to a jury case. I personally am not aware of a jury case ever in the ERISA context, so we'll see what happens with regard to the Cornell case as it goes forward, but with regard to most of these cases, jury demands are routinely stricken because the law has well been settled that this is an equitable claim. A couple of other points to put on for the court With respect to the failure to monitor claim, there is a lot of attention given to the concept of failure to monitor by our opposing counsel. That claim the district court found was waived and forfeited below because they did not respond to it with regard to the briefing, so we are positioned first as the claim, any failure to monitor claim is waived and forfeited. Regardless of that, however, both, as your honor pointed out, there was a set of investments that Northwestern had in 2011 and 2012, they changed their investment lineup in 2016, which is actually what you want a prudent fiduciary to keep doing, is updating their investment lineup over a period of time. There's nothing wrong with that fact pattern, that's exactly what you want an investment fiduciary to do. Who made those decisions? Those decisions are made by a committee, which is referred to in the complaint and then approved by an executive vice president, pursuant to a delegation of authority that flows through Northwestern. And after careful study, and the committee is made up of several professors and several administrators, ranging from finance professors to senior administrators at the university, so a very sophisticated committee. Who decides who's on the committee, I guess? The committee is appointed by the administration, so it's appointed, I believe, by the executive vice president. Universities are a little bit more complex with regard to corporations in terms of figuring out how that works, but it's the executive vice president. With regard to, there are other allegations that they make with regard to the complaint, and I want to go to one of your questions that you asked about the second amended complaint, difference between retail and institutional classes, so that I've got our position out on that. What happened in this case is that Northwestern moves to dismiss early on in the case. We file a motion to stay discovery, that motion is not granted. We go through all of discovery. We have in the briefs, it's $4 million, more than a dozen people are deposed, all kinds of electronic discovery. Six days before the end of discovery, the plaintiffs throw in, move to amend, and add a second amended complaint. With regard to that second amended complaint, the district court below goes through the second amended complaint, and with regard to each of the claims, the district court below says that it's too late. That it's too late to go ahead and amend that second amended complaint, because we've already been through discovery. You knew many of these things earlier, and you could have brought it to the attention of the court and the attention of the other party. That has real prejudice for Northwestern, has real prejudice in two respects. One respect is that we spent all this money. The other respect is, if we were going to go investigate all of the retail versus institutional funds that they talk about, that would be discovery into each one of those, with regard to not only public documents, but subpoenas of all those third parties to see what arrangements they've made in all kinds of different circumstances to defend ourselves. So there's real prejudice, but moreover, with regard to the allegations of the second amended complaint, each and every one of them, the district court judge went through in great detail and explained that it was futile under Rule 12b-6 in any event. With regard to the retail institutional distinction, we think the Loomis case handles that distinction. With regard to the information issue, the district court, we think, had that right. And with regard to the ISP, the district court had that right. So, Your Honors, Your Honors, the bottom line with regard to this case is, ERISA is intended to allow fiduciaries to discharge their fiduciary duties appropriately by offering these types of plans. And it's intended to promote these types of plans. Northwestern offers a wonderful plan to its employee population, very diverse employee population. The purpose of ERISA, as pointed out in the Amici brief, was essentially to avoid things like Jimmy Hoffa, the Studebaker closing, and things like that. There is nothing untoward about what Northwestern did here, other than the very good deed of offering a generous and robust pension plan that satisfies the decisions of this court. So, thank you very much for your time. Thank you, Mr. Martin. Mr. Wolfe. Thank you. Thank you, Your Honor. The Braden case is an important decision. It sets the pleading standards for ERISA fiduciary breach cases. It was relied on by the Third Circuit in the Sweedy case to say that just because you have a range and mix of investments doesn't mean that you could not possibly have breached your fiduciary duties. It was relied on by this court and Allen versus Great Bank Trust to hold that plaintiffs have to be allowed to only plead indirectly on the fiduciary breach their duty regarding an ERISA plan. So, this court has already relied on Braden for setting that standard, allowing indirect pleadings, and not having to plead the specific process facts to which they do not have access. Braden was not a case in which the fiduciaries themselves benefited from the revenue sharing arrangement. The court reads that case closely. The revenue sharing was paid to the plan's record keeper, Merrill Lynch, who was the trustee. Walmart didn't receive any of that revenue sharing. So, it's not about fiduciary self-dealing. It's just the fact that the service provider is getting benefits out of the plan that it should not have. Exactly what was happening in this case. Mr. Wolf, do you read the Third Circuit in Sweedy moving away from its previous opinion and run for them? Yes, it is. Doing so well, it's not moving away from its opinion. It's correcting defense firms who are saying that mix and range of investments, we don't have any duties. And the court is saying no, that's not true. Just in that case, with those pleadings, without anything specific about what's wrong with any of these funds, that's not enough to state a claim. But when, like you have in this case, you have specific allegations of what's specifically wrong with the funds that you have in the plan. Just because there was a mix and range of investments doesn't mean the fiduciaries could not have committed a breach. And this all results from an important decision by the Supreme Court in the Tibble vs. Edison case. The Supreme Court said, an ERISA fiduciary has a duty to monitor planned investment options and remove imprudent ones. That's the law of the world. Fiduciaries cannot rely on the fact that they had a mix and range of investments to say well, we didn't have to remove imprudent funds. We had a mix and range of investments. That's it. That's all we need to do. That can't be the law. And Sueda points out, that is not the law. So long as you show something specifically wrong in this plan and aren't just saying, oh you just used all the mutual funds from a single investment company, then you state a claim. And that is exactly what we've done in this case. Loomis did not concern share class, different cost share classes of the same mutual fund. The Tibble vs. Edison case was entirely about the imprudence of providing institutional shares of the mutual fund, providing retail shares of the mutual fund instead of the institutional shares, which are far less expensive than available to multi-billion dollar plans. The court in Tibble, before it went up to the Supreme Court, said that's a breach. And the court after Tibble, when it was remanded to consider all of the funds that were in retail instead of institutional shares, again said that's a breach. Loomis involved what the court said were privately held trust and commingled pools, closed funds, something that aren't mutual funds at all. Loomis was addressing a broadside attack on mutual funds as investment vehicles in this case. We're not saying you should be in commingled pools or privately held trust because those aren't available in these sorts of plans. We're just saying that you should have been in the less expensive share of the exact same mutual fund, which the Supreme Court and the Ninth Circuit in Tibble vs. Edison recognized as a clear-cut fiduciary breach. Thank you, Mr. Wolf. Thank you, Mr. Martin. The case will be taken under revised. Thank you.